IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| **JASON S. MCNUTT,** )<br>    Plaintiff ) <br>v. ) <br> ) <br>**NANCY A. BERRYHILL,**[1] ) <br>**Acting Commissioner of** ) <br>**Social Security,** ) <br>    Defendant ) <br> ) | Civil Action No. 1:16cv00001 <br> **MEMORANDUM OPINION** <br><br><br> By:   PAMELA MEADE SARGENT <br> United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Jason S. McNutt, ("McNutt"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

-1-

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McNutt protectively filed his applications for DIB and SSI on December 9, 2011, alleging disability as of September 15, 2010, due to post-traumatic stress disorder, ("PTSD"); left arm, shoulder and bilateral knee problems; anxiety; panic attacks; depression; and back pain. (Record, ("R."), at 211-17, 227, 231, 257.) The claims were denied initially and upon reconsideration. (R. at 113-15, 122-25, 127-32, 134-36.) McNutt then requested a hearing before an administrative law judge, ("ALJ"). (R. at 137-38.) The ALJ held a hearing on May 29, 2014, at which McNutt was represented by counsel. (R. at 40-69.)

By decision dated July 17, 2014, the ALJ denied McNutt's claims. (R. at 20-35.) The ALJ found that McNutt met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015. (R. at 22.) The ALJ found that McNutt had not engaged in substantial gainful activity since September 15, 2010, the alleged onset date.[2] (R. at 22.) The ALJ found that the medical evidence established that McNutt had severe impairments, namely mild sensorineural hearing loss; bilateral chondromalacia patellae; low back issues; back

---

[2] Therefore, McNutt must show that he was disabled between September 15, 2010, the alleged onset date, and December 31, 2015, the date last insured, in order to be eligible for DIB benefits.

and shoulder residuals from a motor vehicle accident; an adjustment disorder with anxiety; a panic disorder without agoraphobia; and PTSD, but she found that McNutt did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-23.) The ALJ found that McNutt had the residual functional capacity to perform simple, repetitive, unskilled, light work[3] that did not require more than occasional climbing of ramps and stairs, kneeling, crawling, crouching and stooping; that did not require more than frequent balancing and reaching overhead with the left upper extremity; that did not require him to work around hazardous machinery, unprotected heights, climbing of ropes, ladders or scaffolds, vibrating surfaces or loud background noise; and that did not require more than occasional interaction with co-workers, supervisors and the public. (R. at 26-27.) The ALJ found that McNutt was unable to perform his past relevant work. (R. at 33.) Based on McNutt's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that McNutt could perform, including jobs as an inspector/grader, a packer and a cleaner. (R. at 34-35.) Thus, the ALJ concluded that McNutt was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 35.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

After the ALJ issued her decision, McNutt pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 1-3.) McNutt then filed this action seeking review of the ALJ's unfavorable decision,

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on McNutt's motion for summary judgment filed July 14, 2016, and the Commissioner's motion for summary judgment filed August 16, 2016.

## II. Facts

McNutt was born in 1974, (R. at 44, 211), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). McNutt completed some college through the military and has an OSHA safety inspection certification. (R. at 45.) He has past work experience as a veterans affairs service officer, a railroad conductor, an OSHA safety inspector, and he served in the military in the infantry as a sergeant. (R. at 45-46, 64-65.) McNutt stated that he received compensable disability through the Department of Veterans Affairs, ("VA"), for service-connected injuries to his knees. (R. at 47.) He stated that the compensable percentage for his bilateral knee condition was 40 percent. (R. at 47.) McNutt also stated that his PTSD has been determined a compensable disability by the VA. (R. at 48.) He stated that he received injuries from a motor vehicle accident in 2008. (R. at 48.) McNutt stated that he could walk up to 15 minutes without interruption and that he could not sit for more than 10 minutes without interruption due to anxiety. (R. at 50.)

Robert W. Jackson, a vocational expert, also was present and testified at McNutt's hearing. (R. at 63-68.) Jackson was asked to consider a hypothetical individual of McNutt's age, education and work history, who would be limited to simple, repetitive, unskilled light work that did not require more than occasional climbing of ramps and stairs, kneeling, crawling, crouching and stooping; that did

not require more than frequent balancing and reaching overhead; that did not require him to work around hazardous machinery, unprotected heights, climbing of ropes, ladders, scaffolds, vibrating surfaces or loud background noise; and that did not require more than occasional interaction with co-workers, supervisors and the public. (R. at 65-66.) Jackson stated that the individual could not perform McNutt's past relevant work, but that he could perform light jobs existing in significant numbers in the national economy, including those of an inspector/grader,[4] a packer[5] and a cleaner.[6] (R. at 66-67.) Jackson was asked to consider the same individual, but who could stand and walk two hours in an eight-hour workday. (R. at 67.) He stated that there would be sedentary[7] jobs available that such an individual could perform, including jobs as an assembler,[8] an

---

[4] Jackson stated that the Dictionary of Occupational Titles, ("DOT"), code for an inspector/grader at the light level is 789.587-014. (R. at 66.) He stated that there would be more than 3,000 of these positions in Virginia and more than 125,000 positions in the United States. (R. at 66.)

[5] Jackson stated that the DOT code for a light packer is 920.685-026. (R. at 66.) He stated that there would be more than 2,700 positions in Virginia and more than 120,000 positions in the United States. (R. at 66.)

[6] Jackson stated that the DOT code for a light cleaner is 323.687-014. (R. at 67.) He stated that there would be more than 3,700 positions in Virginia and more than 130,000 positions in the United States. (R. at 67.)

[7] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

[8] Jackson stated that the DOT code for a sedentary assembler is 713.687-018. (R. at 67.) He stated that there would be more than 800 positions in Virginia and more than 35,000 positions in the United States. (R. at 67.)

inspector/grader[9] and a machine operator.[10] (R. at 67.) Jackson was asked to consider the same individual, but who could stand for 15 minutes, sit for 10 minutes, walk 50 to 100 feet or for up to 15 minutes and who would be off task 15 to 20 percent of a workday. (R. at 68.) He stated that there would be no jobs available that such an individual could perform. (R. at 68.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Shirish Shahane, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; and Salem Veterans Affairs Medical Center, ("VAMC").

The record shows that McNutt received treatment from VAMC from August 2003 through December 2013 for backaches; panic disorder without agoraphobia; closed clavicle fracture; hypertension; hypercholesterolemia; joint pain; adjustment disorder with mixed anxiety and depressed mood; and chondromalacia patellae. (R. at 288-572.) On July 16, 2010, x-rays of McNutt's right knee were normal. (R. at 362.) On December 6, 2010, an audiology examination showed McNutt's hearing acuity to be within normal limits and tinnitus. (R. at 310-12.)

On May 12, 2011, McNutt was voluntarily admitted for increased anxiety, secondary to stress. (R. at 306-10.) He reported that he recently broke up with his girlfriend. (R. at 307.) Upon discharge the following day, it was noted that McNutt

---

[9] Jackson stated that the DOT code for an inspector/grader at the sedentary level is 669.687-014. (R. at 67.) He stated that there would be more than 960 positions in Virginia and more than 48,000 positions in the United States. (R. at 67.)

[10] Jackson stated that the DOT code for a sedentary machine operator is 690.685-258. (R. at 67.) He stated that there would be more than 1,300 positions in Virginia and more than 40,000 positions in the United States. (R. at 67-68.)

was in a stable mental state and was devoid of any acute psychosis, paranoia, persecutory ideation and any mood instability. (R. at 308.) He was diagnosed with an adjustment disorder with anxiety and depressed mood; panic disorder without agoraphobia; and PTSD. (R. at 307.) His Global Assessment of Functioning score, ("GAF"),[11] upon admission was assessed at 47,[12] and upon discharge, his GAF score was assessed at 55.[13] (R. at 307.) On June 1, 2011, it was noted that McNutt called requesting a refill on his hydrocodone prescription. (R. at 352.) It was noted that McNutt had received 201 tablets of hydrocodone since May 9, 2011. (R. at 352.) McNutt was advised that this was in violation of his pain contract and that no refills would be issued before the allowable time. (R. at 352.)

On June 16, 2011, Dr. Mark B. Detweiler, M.D., M.S., a psychiatrist with VAMC, saw McNutt for medication management and interpersonal therapy. (R. at 344-46.) McNutt reported that his mood was "better" and that he was trying to find a job. (R. at 344.) He stated that he was considering going to school for a vocation that would allow him to be outdoors. (R. at 344.) He denied bilateral knee pain and was not wearing knee braces. (R. at 345.) Dr. Detweiler reported that McNutt made good eye contact; he was pleasant and cooperative; his thoughts were logical and goal-oriented; his thought content was without any suicidal or homicidal ideations, plan or intent; he did not endorse hallucinosis or behavioral dyscontrol; he was

---

[11] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[12] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[13] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

oriented; and his insight and judgment were deemed fair to good. (R. at 345.) Dr. Detweiler assessed McNutt's then-current GAF score at 55. (R. at 346.) On August 23, 2011, Dr. Detweiler saw McNutt for medication management and interpersonal therapy. (R. at 333-35.) McNutt reported that he had returned to work and felt "great." (R. at 333.) He stated that he was working for a construction company and was in a training position for being an "OSHA safety superintendent." (R. at 333.) McNutt reported that his anxiety had decreased and denied other symptoms. (R. at 333.) Dr. Detweiler reported that McNutt was suntanned; looked healthy; walked without a knee brace; was pleasant, cooperative and overly solicitous; his thoughts were linear, logical and goal-oriented; his thought content without any suicidal or homicidal ideations, plan or intent; he did not endorse hallucinosis or behavioral dyscontrol; he was oriented; his insight and judgment were good; and he had returned to a baseline behavior. (R. at 334.) Dr. Detweiler assessed McNutt's then-current GAF score at 70[14] to 75.[15] (R. at 335.)

On September 20, 2011, Dr. Detweiler discussed with McNutt the problems of him getting clonazepam due to his continually changing address and the "cast of persons in his environment who may not be totally interested in his welfare." (R. at 327.) McNutt reported that he lost his construction job. (R. at 327.) He stated that he continued to look for a job and a permanent place to live and that he had a job interview scheduled that week. (R. at 327.) Dr. Detweiler assessed McNutt's then-current GAF score at 55. (R. at 328.) On November 1, 2011, McNutt reported that

---

[14] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

[15] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors ...; no more than slight impairment in social, occupational, or school functioning...." DSM-IV at 32.

his anxiety symptoms were responding well to medication. (R. at 323.) Dr. Detweiler noted that McNutt's affect was euthymic with full range; his thought processes were linear, logical and goal-oriented; his thought content was without any suicidal or homicidal ideations, plan or intent, without paranoia, delusions or compulsions; and his insight and judgment were good. (R. at 323.) McNutt's then-current GAF score was assessed at 65. (R. at 324.)

On January 26, 2012, McNutt reported that he was attempting to get a job on an American army base in Germany so that he could be near his son. (R. at 464.) On February 13, 2012, McNutt reported that hydrocodone worked well at controlling his back pain. (R. at 458.) On February 21, 2012, McNutt reported that he had been working temporarily doing house remodeling. (R. at 454.) He stated that he still experienced anxiety attacks, but that they responded well to clonazepam. (R. at 455.) McNutt stated that he continued to search for work. (R. at 455.) Dr. Detweiler reported that McNutt was pleasant and cooperative; his affect was dysthymic with full range; his thought processes were linear, logical and goal-directed; his thought content was without suicidal or homicidal ideations, plan or intent, without any paranoia, delusions or compulsions; and his insight and judgment were unclear. (R. at 457.) Dr. Detweiler assessed McNutt's then-current GAF score at 60 to 65. (R. at 457.)

On March 20, 2012, McNutt reported feeling helpless and powerless due to being homeless and unemployed. (R. at 434.) He stated that he was actively searching for employment. (R. at 434.) On April 17, 2012, McNutt reported that his motor vehicle accident settlement was coming to completion, and he hoped to be in a position to get vocational rehabilitation or to start a new job. (R. at 419.) He stated that he hoped to move to Michigan with his father to start a new life and

career. (R. at 419.) Dr. Detweiler reported that McNutt was pleasant, cooperative and smiling with only positive aspirations and expectations; his mood was "feeling better;" his affect was euthymic with full range; his thought processes were linear, logical and goal-oriented; his thought content was without suicidal or homicidal ideations, plan or intent; and he had no hallucinosis or behavioral dyscontrol. (R. at 420.) McNutt reported that he had some aversion to driving and fear of cars due to his motor vehicle accident. (R. at 420.) Dr. Detweiler assessed McNutt's then-current GAF score at 60 to 65. (R. at 421.) On May 11, 2012, McNutt reported that he was staying with a friend on the friend's farm and that he performed odd jobs, including cutting grass with a tractor. (R. at 412.) His mental status examination was normal, and Dr. Detweiler reported that McNutt was "very stable on merely clonazepam." (R. at 414.)

On August 14, 2012, McNutt reported that his mood was "okay." (R. at 474.) He stated that he was driving more and believed that he was "getting better." (R. at 474.) McNutt reported that his anxiety symptoms had decreased and that his medication was working well. (R. at 475.) Dr. Detweiler reported that McNutt walked with no evidence of pain; he was tanned; he had good grooming; he made good eye contact; he showed no anxiety; his mood was good; his affect was euthymic with full range; and his insight and judgment were good. (R. at 475.) McNutt voiced no complaints other than financial problems. (R. at 475.) Dr. Detweiler assessed McNutt's then-current GAF score at 65 to 70. (R. at 475.) On October 5, 2012, McNutt expressed frustration after learning that his hearing involving his motor vehicle accident was postponed. (R. at 479-80.) He stated that his attorneys told him that he could not go back to work because it would hurt his case. (R. at 480.) McNutt stated that he wanted a new and challenging career. (R. at 480.) McNutt stated, "I'm not depressed, I'm just angry." (R. at 481.) Dr.

Detweiler reported that McNutt's affect was dysthymic with mild restriction; he had futuristic plans regarding a new job and trying to see his son in Germany; and his insight and judgment were intact. (R. at 481.) Dr. Detweiler assessed McNutt's then-current GAF score at 65 to 70. (R. at 481.)

On March 12, 2013, McNutt requested a refill on his oxycodone, stating that he was being "deployed in [three] hours." (R. at 501.) On March 19, 2013, McNutt reported that he had to get a job to prove to the court that he could support himself and his son. (R. at 494.) McNutt reported that he continued to do jobs when possible. (R. at 494.) Dr. Detweiler reported that McNutt displayed stress due to complications from an abscessed tooth; his mood was anxious, and his affect was anxious with mild to moderate restriction; his insight was fair; and his judgment was poor, as McNutt got a second clonazepam prescription from another VA clinic; thus, he was unable to refill his prescription. (R. at 495.) Dr. Detweiler assessed McNutt's then-current GAF score at 50 to 55. (R. at 495.) On April 30, 2013, McNutt denied depression stating that he was anxious due to the pending decision concerning his motor vehicle accident. (R. at 508-10.) He reported that he did odd jobs when they were available. (R. at 509.) Dr. Detweiler reported that McNutt's affect was anxious with mild to moderate restriction; his thoughts were logical, linear and goal-oriented; and his insight and judgment were fair. (R. at 509-10.) Dr. Detweiler assessed McNutt's then-current GAF score at 50 to 55. (R. at 510.)

On July 2, 2013, McNutt presented walking with a cane; his affect was angry and anxious due to the inability to get any action from his lawyers on his motor vehicle accident case; his thought processes were linear, logical and goal-oriented; and his insight and judgment were fair to good. (R. at 530-32.) McNutt

reported that he had been power washing houses for two days for 12 hours each day. (R. at 530.) Dr. Detweiler assessed McNutt's then-current GAF score at 50 to 55. (R. at 532.) On September 3, 2013, McNutt was "down" as a result of life difficulties and not being able to see his son; however, he refused anti-depressant medication. (R. at 534.) On October 28, 2013, McNutt presented to the emergency department at VAMC, requesting medication refill. (R. at 546.) He complained of left shoulder pain, bilateral knee pain and lower back pain. (R. at 546.) McNutt ambulated from the department with a steady gait, and no distress was noted. (R. at 548.) That same day, McNutt saw Dr. Kathryn Quinn Johnson, D.O., a psychiatry resident at VAMC. (R. at 548-51.) McNutt reported that he was not depressed, and he denied recent panic attacks or overwhelming anxiety. (R. at 549.) He stated that his anxiety and stress had decreased. (R. at 549.) He stated that he tried to stay active on his ranch, but that it was difficult because of the injuries he sustained in a motor vehicle accident. (R. at 549.) Dr. Johnson reported that McNutt was alert and oriented; he had good hygiene and grooming; he made good eye contact; answered questions thoughtfully and appropriately; his speech demonstrated normal rate, tone and volume; his affect was euthymic; his mood was congruent; his thoughts were linear, logical and goal-directed; his thought content was negative for suicidal and homicidal ideations, paranoia, hallucinations, tangentiality, flight of ideas and grandiosity; his insight, judgment and impulse control were intact; and his cognition and memory were grossly intact. (R. at 550.) This assessment was affirmed by supervising psychiatrist, Dr. Rizwan Ali. (R. at 551.)

On December 5, 2013, x-rays of McNutt's cervical and thoracic spines were normal. (R. at 559.) X-rays of McNutt's left and right clavicle showed intact hardware on the left and no other abnormalities. (R. at 559-60.) On December 11,

2013, McNutt complained of bilateral knee, left shoulder and back pain. (R. at 571.) A TENS unit and hinged knee braces were prescribed. (R. at 571.) On December 16, 2013, McNutt reported that the TENS unit, medication and stretching were helping with his pain. (R. at 570.)

On January 26, 2012, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that McNutt had no restrictions in his activities of daily living; had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that he had experienced no repeated episodes of decompensation of extended duration. (R. at 73-74.) Leizer noted that McNutt's impairment was well-controlled with medication. (R. at 73.)

On January 26, 2012, Dr. Shirish Shahane, M.D., a state agency physician, opined that McNutt had the residual functional capacity to perform medium[16] work. (R. at 74-76.) He opined that McNutt could frequently climb ramps and stairs, balance and stoop and occasionally climb ladders, ropes and scaffolds, kneel, crouch and crawl. (R. at 75.) Dr. Shahane opined that McNutt would be limited in his ability to reach overhead with his left upper extremity. (R. at 76.) No visual or communicative limitations were noted. (R. at 76.) He opined that McNutt should avoid working around concentrated exposure to hazards, such has machinery and heights. (R. at 76.)

---

[16] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2016).

On February 7, 2013, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF, indicating that McNutt had no restrictions in his activities of daily living; had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that he had experienced no repeated episodes of decompensation of extended duration. (R. at 94-95.) Perrott noted that McNutt's impairment was well-controlled with medication. (R. at 95.)

On February 11, 2013, Dr. Lewis Singer, M.D., a state agency physician, opined that McNutt had the residual functional capacity to perform medium work. (R. at 96-98.) He opined that McNutt could frequently climb ramps and stairs, balance and stoop and occasionally climb ladders, ropes and scaffolds, kneel, crouch and crawl. (R. at 97.) Dr. Singer opined that McNutt would be limited in his ability to reach overhead with his left upper extremity. (R. at 97.) No visual or communicative limitations were noted. (R. at 98.) He opined that McNutt should avoid working around concentrated exposure to hazards, such has machinery and heights. (R. at 98.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is

not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir.

1975).  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

McNutt argues that the substantial evidence does not exist to support the ALJ's finding that a significant number of jobs exist that he could perform. (Memorandum In Support Of Motion For Summary Judgment Or Remand, ("Plaintiff's Brief"), at 3-7.) McNutt also argues that the ALJ failed to properly evaluate his credibility. (Plaintiff's Brief at 3, 7-9.) In addition, McNutt argues that his case should be remanded pursuant to sentence six for consideration of additional evidence. (Plaintiff's Brief at 3, 9-15.)

McNutt argues that the ALJ erred by posing a hypothetical to the vocational expert that did not place any restrictions on his "concentration, persistence or pace." (Plaintiff's Brief at 6-7.) Although the ALJ addressed McNutt's limitations in terms of social functioning, by limiting him in terms of interactions with the public and co-workers, McNutt argues the ALJ failed to address the limitations in terms of McNutt's "moderate" difficulties with concentration, persistence or pace or to explain why no limitation was necessary. (Plaintiff's Brief at 6-7.) McNutt cites *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) in support of his argument.

In *Mascio*, the Fourth Circuit held that an ALJ does not generally account for a claimant's limitations in concentration, persistence and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. *See Mascio*, 780

F.3d at 638. The court noted that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638; *see also Sexton v. Colvin*, 21 F. Supp. 3d 639, 642-43 (W.D. Va. 2014) (citing *Wiederholt v. Barnhart*, 121 F. App'x 833, 839 (10th Cir. 2005) (holding that a limitation to simple, unskilled work does not necessarily accommodate a person's difficulty in concentrating on or persisting in a task, or maintaining the pace required to complete a task)). In *Mascio*, the Fourth Circuit found that the ALJ did not explain why Mascio's moderate limitation in concentration, persistence or pace did not translate into a limitation in his residual functional capacity. The court noted, however, that the ALJ may find that the concentration, persistence or pace limitation would not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. *See Mascio*, 780 F.3d at 638; *see also Hutton v. Colvin*, 2015 WL 3757204, at *3 (N.D. W. Va. June 16, 2015).

*Mascio* does not broadly dictate that a claimant's moderate impairment in concentration, persistence or pace always translates into a limitation in the residual functional capacity. Rather, *Mascio* underscores the ALJ's duty to adequately review the evidence and explain the decision, especially where, as the ALJ held in *Mascio*, a claimant's concentration, persistence or pace limitation does not affect the ability to perform simple, unskilled work. The ALJ has the responsibility to address the evidence of record that supports that conclusion.

In this case, the ALJ found that McNutt suffered from a moderate limitation in his concentration, persistence and pace, (R. at 26), despite that psychological evidence before her stated that McNutt suffered from only a mild limitation in his

concentration, persistence and pace. (R. at 73-74, 94-95.) Furthermore, the ALJ's opinion makes no effort to reconcile this finding with her finding that McNutt was capable of simple, repetitive, unskilled work. That being the case, I find that McNutt's argument on this point is persuasive, and I will remand this case to the Commissioner for further development on this issue.

Based on the above reasoning, I find that substantial evidence does not exist to support the ALJ's conclusion that McNutt was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered remanding McNutt's claims to the Commissioner.

DATED:   April 10, 2017.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE